## Charles Simons v. The State.

No. 4374.   Decided February 10, 1909.

Rehearing Denied June 9, 1909.

**1.—Gaming—Private Residence—Public Place—Gambling House.**

Where upon trial, under article 389 Penal Code, of unlawfully permitting a house to be used for gaming, etc., the evidence showed all the indicia and all the evils of a gambling establishment; the profit of the keeper, the equipment of the house and the usual allurements, together with habitual playing of cards, the conviction is sustained, notwithstanding the house was defendant's private residence.

**2.—Same—Repeal by Implication.**

Repeals by implication are not favored; and the Act of the Thirtieth Legislature p. 107, does not in terms or by implication repeal article 389 Penal Code.

**3.—Same—Argument of Counsel—Date of Offense.**

Where upon trial for gaming it was not manifest that the State's counsel alluded to the death of the county attorney of Tarrant County to inflame the minds of the jury, but that he did so to fix the date of the offense, there was no error.

**4.—Same—Allusion to Defendant's Failure to Testify.**

Where upon trial for gaming the reference to defendant's failure to testify was of the most casual nature and was not of such gravity as to require reversal, there was no error.

Appeal from the County Court of Navarro.   Tried below before the Hon. C. L. Jester.

Appeal from a conviction of unlawfully permitting a house to be used for gaming; penalty, a fine of $25.

The opinion states the case.

*L. B. Cobb* and *E. J. Gibson,* for appellant.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, Judge.—Appellant appeals from a judgment convicting him on a charge preferred by indictment, in that he did unlawfully permit a game with cards to be played in a house under his control, the said house being then and there a public place—that is, a gaming house. The indictment preferred against him contained a number of counts, some of which, however, were quashed on motion of appellant; and but two of the counts were sustained and submitted to the jury, being the one under which he was convicted; and another count which alleged, in substance, that appellant unlawfully played and bet at a game played with cards, said game being alleged to have been played at a private residence occupied by a family, which private residence was commonly resorted to for the purpose of gaming.

1. It is urgently insisted that the evidence will not sustain a conviction under the particular count on which the verdict of the jury rests. If this is true, it would follow that the case should be reversed; but we

can not accede to this contention. That the house where the game was played was occupied by the family of appellant, as a private residence, is unquestionably shown by all the testimony. That cards were played there frequently—indeed, commonly—covering a considerable period of time, the record shows beyond any sort of doubt. In the case of Herrin v. State, 50 Texas Crim. Rep., 351, it was held that, on a trial for playing a game with cards at a private residence, where the evidence showed that there were three or four games played, in which five or six parties indulged, in defendant's residence, where he and his family resided, this was sufficient to show that the place was a common resort for gambling. In that case Judge Davidson, speaking for the court, says: "Nor do we think the contention is well taken that the evidence is not sufficient. It shows there were three or four games played, in which five or six parties indulged, in appellant's residence, where he and his family resided, and in the dining room of said residence; that these games occurred shortly after the holidays. The two witnesses testifying to these facts participated. We believe that under the authorities this is sufficient evidence to show that it was a common resort for gambling. Wheelock v. State, 15 Texas, 257; State v. Norton, 19 Texas, 102; Lynn v. State, 27 Texas Crim. App., 590; Hopkins v. State, 33 S. W. Rep., 975; Floeckinger v. State, 45 Texas Crim. Rep., 199." Now let us examine the facts in this case. Dr. Knox testified that he was at appellant's place during the preceding winter and spring four or five times; that appellant had given him a general invitation to come there whenever he felt like it and have a cold bottle of beer, and said that we might get up a game of cards; that sometimes when he was there card games were played, and sometimes they were not; that when card games were played there was betting on the games; that he had seen as high as a dozen people there when these games were played, and appellant was present on each occasion when he was there, and that on one of these occasions he saw from ten to thirteen people present when a game of cards was being played; that he was a friend of the family, and considered himself perfectly welcome at appellant's home.

J. B. Rowland testified that, during the winter and spring previous to the trial, he was at appellant's house three or four times—maybe more times than that; that once or twice when he was there they were playing poker and drinking beer; that the first time he was there there must have been fifteen present and playing cards; that those present generally participated in drinking a bottle of beer, smoking cigars, eating a lunch, etc., and had a general nice time. That he saw appellant playing in one of these games of poker; that there was betting on these games; that the participants would buy checks or chips to bet with, and sit around the table and play poker with cards, and use the checks or chips to bet with; that appellant usually had the checks, and they were obtained from him; that the checks were of different colors and represented different values. That the checks used in playing said

games were cashed by appellant, and that most of the time he was present; that these games of poker were played on an ordinary round table with a hole in the center; that these checks were put through this hole into a receptacle for the "take off;" that he did not know who this went to, but that this "take off" was a contribution from the different players in the house to the man in charge of the game. He further states that the house had several rooms, and that he saw a game in two of the rooms, but had only seen gaming in the front room on one occasion, and that was the night of the big crowd. On cross-examination he testified that he could not swear there were more than two games of poker there between January and April 1st, but his impression was that there were more than two games. He further testified that usually he was told that they were going to have a game, and 'phoned to or notified to come down there; that on the occasion referred to he did not see Dr. Knox present, but saw one Ruth there on one occasion. This witness, G. W. Ruth, testified that during the spring and fall preceding the trial he had been at appellant's house five or six times; that he was invited there to have a poker game, and sometimes was there on other business. That he and appellant were nothing more than friends. He further says: "Sometimes after I got there a game would come up. I saw gambling there a few times; don't recollect exactly how many times—maybe two or three times, more or less." He further says that these games were usually played in the north or back room; that it was fitted up with a round table with a hole in the center, and the checks were put through this hole into a little place for the "take off." He further states: "Sometimes when I was there there wouldn't be any people there, and sometimes there would be as many as a dozen." He also testifies: "Sometimes defendant was there and sometimes not; when he was not there, just first one and then another of the players would look after the matter and see to the checks, and 'take off,' etc. When the crowd was too big for one room the overflow would play in the front room." On cross-examination he testified that "the windows were frequently open, and the house was well lighted. I saw women and children there, and frequently neighbors dropped in." That among those who were there there were some highly respectable people, whose names he gives; that no idlers or professional gamblers were there, but those present were a well-behaved, orderly crowd of gentlemen. He also testified as follows: "Defendant and his family provided the supper and beer that was participated in down there. In the games played there was a 'take off,' and I suppose it went to them for the beer and supper. Sometimes the boys put in and bought the beer and lunch; I guess the 'take off' went to pay for such refreshment."

Ike Kiser testified that he was invited over the 'phone at his residence to come to appellant's place; that he was there once, and saw gambling there, but was not there at any other time. He says that "defendant 'phoned me to come in; that they would have a game of

poker that night at his house. I had told him if he got anything 'easy' to let me know, and I would come in and play." He also testified on cross-examination: "There were no gamblers or loafers permitted there; if I had thought that gamblers or loafers were permitted there I would not have been there. There was no effort of concealment. The windows were open and the house lighted." We think this evidence shows, beyond any sort of doubt, that appellant had substantially converted his residence into a gambling establishment, and that same was, to all intents and purposes, under the law, a gaming house. See Thorp v. State, 42 Texas Crim. Rep., 231; 59 S. W. Rep., 43. To hold otherwise, in the face of this record, would permit the statute against gambling to be nullified on the ground that it was sheltered beneath the roof of a private residence. The fact that it is a private residence, if devoted to gambling, can make no difference. Here were all the indicia and all the evils of a gambling establishment; there was the profit of the keeper in what is termed the "take off;" there is the equipment in the table with the hole in the center; there is the usual accompaniment of beer, or other liquors, and there is the additional allurement, as shown by the testimony of Kiser, who wanted to go in on the game when he had something "easy." We think the conviction is well sustained by the evidence, and that no other verdict, if this had been the only count submitted, could in fairness, or ought in honesty, to have been returned by the jury.

2. Counsel for appellant makes the point that the indictment is defective, and that the same charged no offense, in that the acts of the last Legislature, chapter XLIX, p. 107, repealed the law under which this prosecution was pending. We think this contention can not be sustained. Appellant was indicted under article 389 of the Penal Code. The Act of the Thirtieth Legislature, noted above, undertook to amend article 388 of the Penal Code, having special reference to gaming tables. It in no sense undertook to amend, and neither amended nor repealed the article of our Penal Code under which this conviction was secured. It is elementary that repeals by implication are not favored. The Act of the Thirtieth Legislature does not in terms repeal the act on which this prosecution was based, nor does it do so by any reasonable or fair inference, and that it was not the intention so to do we think it is so manifest and clear as to admit of no doubt.

3. Again, counsel for appellant seek a reversal on account of the conduct of the county attorney of Navarro County in asking a witness, when he saw gaming at appellant's home, with reference to the date of the death of Jeff McLean, county attorney of Tarrant County. It is claimed by appellant that this reference to the death of Mr. McLean was for the sole purpose of calling attention to and emphasizing the enormity of the evils of gambling by reference to the tragic death of this lamented officer, and of inflaming the minds and exciting the prejudices of the jury against appellant. Such purpose was disclaimed by the county attorney; and the court, in admitting the question and

answer, in terms stated to the jury that same were admitted solely and only for the purpose of enabling the witness to fix the date of the events to which he was testifying. We can not, and ought not, to ascribe unworthy motives to the county attorney or any other law officer, and, indeed, any of the counsel, unless such purpose is manifest. We do not believe, as presented, that this furnishes sufficient reason why a judgment of conviction, otherwise in all respects legal, should be set aside and the work of the law undone.

4. A new trial was also urged on the ground that some reference was made to the failure of appellant to testify. This matter was not discussed by the jury. It is not testified to, nor shown anywhere by anyone, that it in fact influenced or affected their verdict. The whole reference was of the most casual nature, and was not of such gravity and importance as, under our decisions, would require the court to grant a new trial.

Finding no error in the proceedings, the judgment is hereby in all things affirmed.

*Affirmed.*

[Rehearing denied June 9, 1909.—Reporter.]