HENRY ROBERTSON v. THE STATE.

No. 1885. Decided February 5, 1913.

Rehearing denied May 7, 1913.

**1.—Gaming—Knowingly Permitting Property to be Used For—Resort to Gamble—Indictment.**

Under article 559, Penal Code, under which defendant was charged with knowingly permitting property under his control to be used to gamble with cards, etc., in one count, and knowingly permitting said property to be used as a place where people resort to gamble, it was not necessary to allege or prove that such property was kept for the purpose of being used as a gambling house.

**2.—Same—Words and Phrases—Kept and Used for Gaming.**

The words "so used" contained in article 559, Penal Code, do not relate back to and make it necessary, in order to commit the offense of knowingly permitting the property to be used for gaming, that it shall also be kept as a gambling house; as property used for gaming need not necessarily be kept for that purpose.

**3.—Same—Sufficiency of the Evidence—Control.**

Where, upon trial of knowingly permitting property under his control to be used to gamble with cards and as a place where people resort to gamble, the evidence sustained the conviction that the defendant was in such control of the property as that he could be convicted of permitting gaming thereon, the conviction was sustained.

**4.—Same—Rule Stated—Practice on Appeal.**

It is not for this court to consider that there was evidence authorizing an acquittal, but simply to determine whether there was sufficient evidence to sustain the conviction.

**5.—Same—Control of Premises—Rule Stated.**

The usual and ordinary signification of the word "control" is the same as the word "manage," which is to have control over the particular matter, to check, to restrain, to govern with reference thereto, and it is not necessary that the party be the owner, renter or tenant of the house to be in control thereof. Following Davis v. State, 151 S. W. Rep., 313, and other cases.

**6.—Same—Case Stated—Control—Sufficiency of the Evidence.**

Where, upon trial of knowingly permitting property under defendant's control to be used for gaming, etc., the evidence showed that defendant had control of the door on the ground floor of said building and the stairway leading up to the second floor and the room on said floor, through which and from which, the only access to the attic where the gaming occurred was had by a ladder therefrom into the attic, and that defendant knew that persons gathered there for gaming, reaching said attic only and solely through his door as aforesaid and that he himself engaged in said gaming, the conviction was sustained, although defendant did not have said attic leased from the owner.

**7.—Same—Statutes Construed—Repeal of Misdemeanor Felony.**

The contention that because articles 551, 572 and 573, Revised Penal Code, make the same acts misdemeanors punishable by fine only, which articles 558 and 559, of said Code, make felonies, are in conflict and nullify each other, is not well taken, as the latter articles repeal the former and are now in force.

**8.—Same—Statutes Construed—Repeal—Legislative Intent.**

See opinion for a discussion of the different Articles of the Code relating to permitting gaming, holding that the Act of 1907 was intended by the Legislature and had the effect of taking the place of and entirely supplanting article

551, Revised Penal Code, and by implication, if not expressly, clearly repealed it. Overruling Simonds v. State, 56 Texas Crim. Rep., 339. Davidson, Presiding Judge, dissenting.

### 9.—Same—Repeal by Implication—Rule Stated.

While repeals by implication are not favored, yet, where a new law covers the whole subject matter of an old law and prescribes a penalty different from that provided in the old law, the old law is repealed by implication. Following Fleeks v. State, 47 Texas Crim. Rep., 327.

### 10.—Same—Revised Code—Codifiers—Statutes Construed.

The recopying in the Revised Penal Code of 1911 of said repealed articles 551, 572 and 573 as well as said articles 558, 559, repealing them did not have the effect to invalidate all of said articles both new and old, but the history of this legislation shows clearly the reverse and that the Legislature did not intend to repeal articles 558 and 559, Penal Code, which is the Act of 1907, and is now the law. Davidson, Presiding Judge, dissenting.

### 11.—Same—Rule Stated—Statutes Construed—Presumption—Codification.

Where a statute upon a specific subject has been repealed, not expressly but by implication, by the enactment of a later statute upon the same subject inconsistent with the first, and both laws are subsequently included in a revision or codification, they still have the same relative force and effect as before the codification; that is to say, the earlier remains repealed by the later statute; the presumption being that the repeal of the earlier statute has been overlooked by the codifiers and the Legislature. Following Ex parte Cox, 53 Texas Crim. Rep., 240, and other cases.

### 12.—Same—Codification—Statutes Construed.

This court holds that notwithstanding said repealed articles 551, 572 and 573 are copied in the Revised Penal Code of 1911 by the codifiers, that they were not thereby re-enacted, but inadvertently and by mistake included therein, and that the said articles 558 and 559 of said Code by the Act of 1907 are still the law and in force as contained in said Revised Penal Code. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of knowingly permitting property under defendant's control to be used for gaming, etc.; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Williams & Williams*, for appellant.—On question of insufficiency of the indictment: Purvis v. State, 62 Texas Crim. Rep., 302, 137 S. W. Rep., 701; Walters v. State, 58 Texas Crim. Rep., 240, 125 S. W. Rep., 11; Parshall v. State, 62 Texas Crim. Rep., 177, 138 S. W. Rep., 759; Goodwin v. State, 65 Texas Crim. Rep., 98, 143 S. W. Rep., 939.

On question of control of property: Kimbrough v. State, 25 Texas Crim. App., 397; Com. v. Wentworth, 15 N. E. Rep., 138; State v. Dowe, 21 Vermont, 484; Stephens v. People, 67 Ill., 587; Youngworth v. Jewell, 15 Nev., 45; Nelson v. Terr., 49 Pac. Rep., 920.

*C. E. Lane*, Assistant Attorney-General, and *C. A. Sweeton*, Assistant Attorney-General, for the State. Latter cited cases in opinion.

PRENDERGAST, JUDGE.—Appellant was convicted for knowingly permitting property under his control to be used to gamble with cards, or knowingly permitting property under his control to be used as a place where people resort to gamble, and his penalty fixed at two years confinement in the penitentiary.

The statute under which the conviction was had is article 559, Penal Code, which was, before the revision of 1911, article 388b of the Acts of 1907, page 107. The said article is as follows:

"Article 559. If any person shall rent to another, or shall keep or be in any manner interested in keeping, any premises, building, room or place for the purpose of being used as a place to bet or wager, or to gamble with cards, dice, dominoes, or to keep or exhibit for the purpose of gaming, any bank, table, alley, machine, wheel or device whatsoever, or as a place where people resort to gamble, bet or wager upon anything whatever, or shall knowingly permit property or premises of which he is owner, or which is under his control, to be so used, shall be guilty of a felony, and upon conviction shall be punished by confinement in the penitentiary not less than two nor more than four years, regardless of whether any of the above mentioned games, tables, banks, alleys, machines, wheels or devices, or things, are licensed by law or not; and any place or device shall be considered as used for gaming or to gamble with or for betting or wagering, if any fees, money, or anything of value is bet thereon, or if the same is resorted to for the purpose of gaming or betting."

There were two counts in the indictment which were submitted to the jury for a finding. The first of these, omitting the usual parts, is as follows: "That on or about the 1st day of September, 1911, and before the presentment hereof, with force and arms in the county and State aforesaid, Henry Robertson did then and there unlawfully and knowingly permit property which was under his control, towit (a certain house, describing it), to be used as a place to gamble with cards."

In order to show the basis for this count in the indictment we will give that portion of the above article 559, which we think clearly is the offense denounced, and in doing so will omit all the other portions of the article which are neither requisite nor proper for the purpose indicated. It is:

"If any person shall knowingly permit property which is under his control to be used to gamble with cards, he shall be guilty of a felony and upon conviction shall be punished by confinement in the penitentiary not less than two nor more than four years."

The other count submitted by the court, omitting the usual parts, is:

"That in the State and county aforesaid Henry Robertson did then and there unlawfully and knowingly permit property which was under his control, towit (a certain house, describing it), to be used as a place where people resort to gamble with cards."

Likewise, quoting that part of said article 559 which applies to this count, it is:

"If any person shall knowingly permit property which is under his control to be used as a place where people resort to gamble, he shall be guilty of a felony and upon conviction shall be punished by confinement," etc., the same as above.

Then applicable to both of these offenses defined and denounced, the latter part of said article 559, quoting in the same way, is: "And any place shall be considered as used for gaming if any fees, money, or anything of value is bet thereon, or if the same is resorted to for the purpose of gaming or betting."

Appellant's main, if not his sole, contention is, that article 559 is not susceptible properly of the construction that we have placed upon it by illustration above, but that as a prerequisite and necessary part thereof, the offense is, and the indictment must allege, that the property where the gaming is alleged to have been permitted, or that the resort thereto for that purpose, *shall be kept for the purpose of being used as a gambling house.* In other words, that the indictment must allege, and in order to secure a conviction, the State must prove, not merely that the appellant permitted the property under his control to be used to gamble with cards, or as a place where people resort to gamble, but that it must allege in the indictment and establish by the proof that he *kept the place as a gambling house for that purpose.* In order to further state appellant's contention, we quote from his brief as follows: "It is evident, and we take it beyond dispute, that to constitute the direct offense of keeping, the premises must be kept for the purpose, nor would any other character of keeping be sufficient to constitute an offense, under the permitting phase of the statute. The statute simply intending clearly to make it an offense to keep a house for the purpose of gambling, or to knowingly permit anyone else to keep a house under one's control for the purpose of gambling. The same character of keeping and the same purpose for which it was kept being identical and necessary elements of each of the offenses. The term 'so used' evidently referring back to the character of use inhibited by the first clauses of the article and intending to prevent the keeping of any building for the purpose of being used as a place to gamble with cards. Whether the act should be done by the person in charge, or merely permitted by one in control, the same character of keeping and the fact that it must *be kept for the purpose* are not only necessary elements of the offense in each instance, but constitute the very gist of the offense."

Appellant preserved and presented his questions and contention in various forms. First, by motion to quash the two counts of the indictment under which the conviction was had; second, by excepting to the charge of the court presenting the questions to the jury for a finding as charged by the indictment; and, third, in his amended motions in arrest of judgment and for a new trial.

The only other contention of appellant necessary to be considered, is his contention that the evidence was insufficient to establish that appellant was in such control of the property as that he could be con-

victed of permitting gaming thereon; or rather, his contention is that the evidence clearly established that he had no such control as that he could be convicted for permitting such property to be so used.

We have thus stated appellant's contentions so that the whole matter can be discussed at once and together. It is unnecessary to take up each separately.

It is the universal rule that when a verdict is attacked because of the claimed insufficiency of the evidence to support it, for this court to consider the evidence solely with the view of determining whether it was sufficient. And not to consider that there was evidence authorizing an acquittal. In other words, we pass upon the sufficiency of the evidence solely as a legal question.

The evidence in this case was amply sufficient to authorize the jury to find, and it was sufficient to clearly establish, that Frank Smith, a witness in the case, was the owner of the house in Mart, Texas, described in the indictment; that the house was on a side street with a very short space intervening between it and the rear of the saloon, fronting the main street, which saloon was run by said Smith a while and later by another or others; that this was a two-story house with a large attic above the ceiling of the second story; that appellant had rented from Smith, and been in exclusive control of, the second story of this house for several years continuously before the indictment in this case and even up to the time of the trial, which he used as a rooming house, there being several,—perhaps eight,—bedrooms on the second floor; that the first story was unoccupied and was not used during this time for any purpose; that the second story was reached by an ordinary stairway from the ground floor up to the landing on the second floor; that a door was at the entrance to this stair on the ground floor. Smith testified that the dimensions of this house were 36x20 feet or 24x40 feet; that the attic was of these dimensions, and was not cut up or subdivided in any way; that the attic was made by the roof sloping from the center to each side, as is usual, and that the edge of the roof came down to about the ceiling of the second story or floor of the attic; that persons could not stand erect in the attic at either side where this roof came down, but they could stand erect in the center of the attic where the top of the roof began. How far on either side from the center persons could stand erect is not disclosed other than by the general description of the attic above. Some four years before this offense was charged, appellant wanted to use this attic as a kitchen and for this purpose Smith fixed it up for him and for a while rented it to him for that purpose, and he so used it, paying $1 per month; this was for only a short time and more than four years before this offense. Afterwards for a few months, which was more than three years before this offense was charged, Smith rented it to another negro, who used it for a few months, then vacated it, or gave it back to his landlord. Since that, which was more than three years before this indictment, Smith had not rented the property to any person for any

purpose, and the only personal property he had therein was one or more pool table chairs. Smith testified they belonged with some pool tables he had, and that they "were around at the saloons and around; that every saloon very near has one." "I have not used that attic for anything during 1909, 1910, or 1911, only the chairs were up there that were mine. I have not used it for anything except to leave the chairs up there. I have not used it for any other purpose." It seems they had been there for several years. The sole and only entrance to this attic was through the door on the ground floor to said stairs, then up said stairs to a landing on the second floor, and thence into, and through, one of the rooms rented, used and controlled by appellant continuously for all of these years. Then up a ladder from this room through a hole in the ceiling as an entrance, to said attic. The witnesses differ about the character of this ladder, some claiming that it was a kind of stair steps made out of 2x4 stuff, nailed to the wall and the floor, but the jury were authorized to find,—because some of the witnesses so testified,—that it was a loose ladder, not fastened or attached either to the floor or wall, but was taken up and down for ingress and egress to said attic as occasion demanded, and that it could be so taken up and down and so used and was so taken up and down and used. That this entrance or hole to the attic was a small place and only one man could go through it at a time; that it was only some fifteen or twenty inches wide, and said hole in the ceiling of the second story, or in the floor of the attic, was a little scuttle hole just room enough for a man to get through; two men could not pass through it at all, and said scuttle hole was just like the holes that are used in ceilings in case of fire.

The only rights whatever reserved by Frank Smith from appellant was the right of ingress and egress for any tenant to whom he might rent the attic; that he had not rented the attic to anyone at any time within the last three years before this charged offense. There was no claim or intimation that any of the numerous parties, as hereinafter shown, who resorted to said attic for gambling purposes were the tenants of Smith, or had any right or claim whatever of ingress or egress to said attic.

The evidence clearly and without doubt shows that appellant had the absolute control and right of control of the said door below, leading to the said stairway from the ground to his said second story, and to the whole of the second story, except as stated above, the sole right of ingress and egress to the attic for only a tenant or renter of Smith for the attic. Among other things said Smith testified: "I did not know that during the years 1910 and 1911 that Uncle Henry (appellant) was using this room (the attic). I did not know that he was using it for a reception room for forty or fifty Mexicans and negroes at a time during the week at nights. I know this, that sometimes I went up there and negroes were setting up there just as thick as they could be. I went up there when they were there setting around. . . . In

order to get up to that attic a person has to go through one of the rooms that Uncle Henry (appellant) has rented and that he is in control of. You can not get to the attic without going through the room that he has absolute control of. . . . There is just a little scuttle hole through the floor where you go up into the attic like one that is used for fire purposes. You can go and move a little board like and go up through the ceiling and get up in the attic; that is the only way there is to get up there."

Among other things, J. B. Fikes testified that he had been up in that attic three different times. He is shown to have been a farmer, and worked a good many negroes; that he brought them to the town of Mart frequently on Saturdays and then took them back with him late in the evening. "On the occasion of my first visit up there (in said attic) I was getting them (his negroes) out of town. That negro went over to Mart with me from the farm, and about sundown I commenced to search for him, and I inquired from other negroes where he was and they told me. I found the negro in old Henry's (appellant's) dive in that three-story building. He was up there in that attic. I went up there myself. There was a big crowd of negroes up there,—about as many as could get up there. I suppose there were forty or fifty head. Henry (appellant) was up there; he was engaged in gambling; this negro here, Henry (appellant), was engaged in gambling. I do not know what kind of game he was engaged in. I went there, got my negro and went out of there. . . . Henry (appellant) was up there in the attic gambling with some parties. He had a monte game going on and they had a crap game. There were three games going on. I think there were enough negroes there to run three games successfully. There were about as many there as could get around. Henry (appellant) was engaged in the game himself. . . . The next time I was up there was along in May. I went up there then to get some of my negroes. I found two of them up there. There was quite a crowd of negroes up there that time. There looked to be twenty-five or thirty head up there. They were gambling. Henry (appellant) was there. He was in the game. They were playing the same old games up there, monte and craps. They play monte with a deck of cards. . . . I think he (appellant) was engaged in playing seven-up. I think that is Henry's game. That is his stronghold. I found my negroes; they were up there. I went up there the third time after my hands. Gambling was going on up there that time. There was a crowd up there. Henry (appellant) was up there." This witness showed that all of his negroes and the other negroes who were up there were gone and had left the country and that there were none of them in the country now. "I knew Henry (appellant). He was there; Henry was there playing seven-up, playing with some more negroes; he was playing every time I went up there."

K. McKenzie, among other things, testified that he knew appellant in Mart and had been all around over Mart and knew appellant's place

of business. "It is out back of a saloon in a two-story building. It is a two-story building back of what used to be Frank Smith's saloon, which is still used as a saloon. . . . I have been up in that building. I was in the second story, and one time I was on in the ceiling of the second story. . . . There were between fifty and seventy-five head of negroes gambling up there. I went up there for three negroes of mine. I found them. I found one of them right at the trap door where I went in. The door is a little scuttle hole that you go through. . . . I could not answer whether all of the negroes that were up there were gambling or not. I saw Henry (appellant) up there. He was banking a monte game. . . . I did not stay there long enough to see whether anybody won or lost any money. They proceeded with the game while I was there. . . . It was in the ceiling of the building where they were. . . . I did not get clean up in this ceiling. I was on the ladder looking up in this ceiling. I was on the ladder. A negro put the ladder up for me to climb on. He put the ladder against the wall. He picked it up and set it up against the wall. I climbed up far enough on the ladder to get my negroes. I got my negroes, put them in the wagon and went home. That ladder there was not a fixture. Dick Knight told me to go up there for my negroes. He said they were up in there gambling. I went over there, and told the negro I wanted to get my negroes out from up there, and he said they didn't allow white people up there. 'I don't give a damn what you allow.' He set the ladder up, and I just got about far enough to get my negroes and I came on down, and got in my wagon, and went home. He (his negro) had $7 and I took it away from him. I gave it back to him when I got home. He told me he won it in a game. He was piking at a monte game when I went up there. The table was covered with cards. Henry (appellant) was banking a game. He was paying off the people that won. He was taking it in if they lost, and paying it out if they won. That negro over there, the defendant, did that. Henry (appellant) was sitting down. The other negroes were all standing up. The majority of them were standing up. . . . Henry, the negro right there (appellant), had the deck of cards. He was changing money, taking it when he won, and paying it out when they won. When they lost he took it in as far as I saw. That was what was happening, as far as I saw the game while I was there. The ladder was against the wall downstairs. A negro fixed the ladder up and let me up on it. I do not know who that negro was. That was an ordinary ladder, the best I remember about it. It did not look like a pair of rough steps. It was a ladder. It was a short ladder. It did not have more than six or eight slats across. The best I remember it was a short ladder from the ceiling. It was a common, cheap built ladder."

W. E. Sansom, another witness, among other things, testified that he was a farmer, living near Mart and worked several negroes; that he took them to the town of Mart occasionally and then carried them back

to his farm. That he went up in this said attic at one time hunting for his negro hands. "I went up in the top part of the building, in the attic part. I went up on the ceiling of the second floor. I saw a bunch of negroes up there. I saw some cards and I saw some money and I suppose they were gambling. There were two tables up there." The witness then showed that he did not at that time know appellant and did not know whether appellant was up there or not; that at the time he was up there there were somewhere about fifteen or twenty negroes up there.

Frank Rhodes, among other things, testified that he had known appellant for about four years; went to Mart often and knew where appellant's hotel was. "It is right behind the saloon that Frank Smith keeps. I have been in that building. I have been in the building four or five times since last cotton season. I saw Henry (appellant) up there. He was always there when I went up. When I went up there I saw going on what I went up there to do. They were gambling. I went up there to gamble. I gambled while I was up there. .· . . When I went up there Henry (appellant) was sitting behind a table where they were shaking dice. He had his box, and when they would make a pass he would take the money, and put it in the box. It was a tin box. I do not know what he put it in there for. A fellow would have to pay his fee. That is what he was putting in the box. I never did see Henry play in any game, only he was sitting at the head of the table. The others were sitting around the table, and were making their passes. I also saw a monte game up there. The men would get around the tables on both sides, and they would deal monte. You play monte with cards. There was not any other kind of game going on up there except these two at that time. There were three monte tables up there, and one crap table. Those were all the games that they were able to pull off at one time. Going on every time I was up there. Henry (appellant) was taking the money, and putting it in the box. He always had a box there. He sat at the head of the table all the time. . . . I just went up there because I knew they were playing up there. There were four tables up there. I can not specify the time when I was up there. It was nearly every time that I went to town. That was this year. Those four tables have been there all the time this year. I first went up there this year early in the year. · There was a chair at each table. There were four tables and some chairs at each table. There were four chairs up there. Henry (appellant) was putting the money in the box. He would get the pass like. Henry (appellant) was not shooting, he was only banking. . . . The game was always going on when I got there. I never did have any conversation with Henry about going up there. I would just go up there. I never asked Frank Smith if I could go up there. I know that I saw Henry (appellant) and I know I saw him there every time I went there. He was the only one I saw taking money and putting it in a tin cup. That was always on the third floor."

Aaron Matthews, among other things, testified that he knew appellant and knew where his place of business was, and identified it as the others as right back of Howell's saloon; that there was just a little alley way between the two places. "I have been in the attic above the ceiling above the second floor. I have been up on the second floor. I have swept there several times. I did not stay there. I saw some fellows gambling there one time. I do not know how many there were in the game. There were as many as seven or eight. I told them to move, that I wanted to sweep there. I do not know exactly how many there were because I did not pay much attention to them. They were not white people. I think two or three of them were Mexicans. . . . I went up there to sweep out for Uncle Henry (appellant). He told me to go up there and sweep out, and said that if I found any bottles I could have them. I could get the bottles and go down to the saloon and sell them for beer. He just called me when I was not doing anything, and told me to go. He told me to go up there several times and sweep out. I will say that I went up there at his request, to sweep out, five or six times. I have been up there a whole lot of times. I saw them gambling when I went to sweep out. They were gambling at the same place I swept out. They were gambling when I went to sweep out and I told them to move. When I saw Henry (appellant) he was down on the bottom floor. He looked like he was going to walk away. He could have come back, and passed me if he wanted to. I have swept out several times for Uncle Henry. When I saw them gambling, they were on the bed in the room, on that side. They were in the room next to the last room on that side. I did not know they were gambling. I was sweeping, and they were playing on the bed. . . . That is where the rooms are. I have been up above that. I went up there for some bottles. I saw some fellows down that way. I was going after bottles and I just got them and did not go any further." In speaking of his having signed a statement before the county attorney, he said he told him he saw them gambling. "I saw one little stack of money on this side. They had cards and they were standing up around there. . . . Uncle Henry (appellant) here is supposed to run a rooming house there. That is what he says. He is supposed to run a rooming house in the second story of that building. He has got me to sweep out for him a number of times. The gambling that I am talking about there was in the bedroom. That is the only gambling that I could swear that I saw. . . . I saw some fellows up there in the loft. That was not the same time I saw the fellows gambling in the room. I can not tell when it was that I was up in the loft after bottles. It was this year. I reckon it has been two or three months ago, or something like that. I do not know how many men were up in the loft when I was there. There were as many as ten or fifteen. There was a right smart crowd of them. . . . The men were down on the floor. I could hear the money rattling."

Charlie Maddox, among other things, testified that he had been living

at Mart about six or seven years off and on. Knew appellant and had known him some six or seven years. That he had had business relations with him and he and appellant were good friends. "We have been partners in things. There were a lot of things that we were partners in. I know where his place of business has been for two years or more. I have been in that place. I never did anything for him, connected with him, with reference to that building, or anything that took place in that building. I have been up there with him. I have played dominoes up there with him, and drank. I never played anything else up there with him. I have played cards in there. I have played in there two or three times during the past two years, maybe four times; I do not exactly know how many times. . . . Henry and I gambled together. He has given me money. We have divided the money that I made. I got money from him any time. He has given me money. Of course. I have got the money from him. I told the county attorney a little while ago that I got money from him with the understanding that I was to use the money to gamble up there in that attic, and we were to divide half and half the money I made in the game. That is what I said. Of course it is true. I have gotten money from him during the past two years with the understanding that I was to take the money and gamble, and if I made anything I was to give him half of it. That is true. I am not scared. Nobody has threatened to do any harm to me for telling the truth. Henry has not threatened to do any harm to me. Nobody at all has threatened to do any harm to me. We were staying upstairs there at the place. We were playing on the bed in the second story. Once is all that I have played on the second floor during the past two years with money that I got from Henry, to divide with him half of what I made. I would gamble at different places there at other times with his money. I would gamble at different places in town, down on the creek, with his money. I never did use any of his money in the loft, or ceiling above the second story of that building. I have gambled up there two times during the past two years. Henry Robertson was there when people were at his place of business. He saw me play. He did not see me when I was playing with his money. I was up there playing one Saturday in May of this year, with some other negroes. Henry Robertson was in there. The boys gave him fifty cents, and he went and got three bottles of beer. I know what a bottle of beer costs. It costs a dime at some places, and fifteen cents at other places. Henry did not give any of that money back of the fifty cents for the three bottles of beer. I was up there along about the second day of September, 1911, just about a week before I made this statement. There was not a house full of negroes there when I was there. I do not remember seeing a house full. Henry was up there. I saw him. When I won with Henry's money I gave him half. When I lost, I lost half. That is the way we were partners. We were not in business together. I have seen fellows give Henry fifty

cents to get some beer with. It was up in the loft and he would go and get the beer and bring it back to the loft."

It was shown that the officers of Mart, shortly before the indictment in this case, raided said attic where gambling was carried on. They and appellant claimed that he had the officers to do so. In one of the raids they found appellant there and arrested him and a large number of other negroes, prosecuted them for gaming; many of them plead guilty, and among them appellant himself, although he denied in this trial, his guilt, claiming that he plead guilty because it was cheaper to plead guilty than it was to fight his case. In the other raid it was shown that there were a large number of negroes up in this attic gambling and that a good many of them escaped by jumping out of windows.

Appellant himself testified and, among other things, that he had some roomers who went up in that attic, but they said they were not playing anything except dominoes. He claims he told them not to gamble and that if they did he would get the officers after them. "Maybe thirty-five or forty or fifty negroes, or maybe more, would come there to my place sometimes on Saturday. They would come there and go up there and get rooms, and stay down and drink, you know." He testified he knew said Fikes, the witness mentioned above. "He caught his negroes up there (in the attic) and got hot at me about it. If the negroes had listened to me, they would not have gambled at all." He denied that he would engage in any games up in this attic, and denied that he had given permission to anybody to gamble either on the second floor or in the attic, and claimed, on cross-examination, that he never did go up in the attic himself. Then he said, "I have been up there. Some roomers were kicking about the fuss they were making. They were disturbing the roomers. I do not remember Charlie (the witness who swore he was a partner of appellant) ever playing up there." He denied that he had played any and denied that he had any partnership in the gambling business with him. "I have been up there in the attic and stopped them. The ones that were up there were strangers. I knew some few of them. I think this boy Cliff was up there. I have stopped people up there within the last two years. I stopped a fellow by the name of Jim and a fellow by the name of John Jones. They were out there in the country picking cotton. That was in May some time. I have gone up there several times and stopped them. I would be lying down asleep and I had nothing else to do with them. Some of the ones that I stopped from gambling up there were that negro Jim and Cliff Johnson, and a fellow by the name of Jess Jones. I went up there once or twice to stop them. I do not know whether it was the same fellows each time or not. I told them that if they did not stop, I would go get the officers. Sometimes those negroes would get out and sometimes they would not. I would tell them that if they did not get out, I would go tell the officers to get them out." Again he testified: "I have gone up there and stopped them from gambling several times." Again, "some fellows called me to the steps one time

and gave me fifty cents and told me to get them three bottles of beer. I did so and got a drink out of it. They were playing dominoes."

Our Supreme Court, in Anderson v. Stockdale, 62 Texas, 61, in defining "control," says: "The usual and ordinary signification of the word 'control' is the same as the word 'manage,' which is to have control over the particular matter, to check, to restrain, to govern with reference thereto."

In Webster's Dictionary it is defined to be, "to exercise restraining or governing influence over; to check; to counteract; to restrain; to regulate; to govern; to overpower." And as synonyms thereof he gives, "to restrain; rule; govern; manage; guide; regulate; hinder; direct, check; curb; counteract; subdue." The Century Dictionary gives substantially the same definition thereto.

7 A. & E. Ency. of Low (2 Ed.), 457, says: "Control means to check, restrain, govern, dominate, direct, regulate; have under command, to hold in restraint, or check subject to authority," citing many cases in support.

In 9 Cyc., 811, it is defined: "To restrain; to check; to regulate; to direct; to govern; to keep under check; to hold in restraint or check; to dominate; to rule and direct; to counteract; to exercise a directing, restraining or governing influence over; to govern with reference thereto; to subject to authority; to have under command and authority or to have authority over the particular matter," citing many authorities in support.

In Alexander v. Commonwealth, 12 Ky. L. Rep., 470, it is held: "One may be guilty of suffering gaming on premises 'in his occupation or under his control,' within the meaning of the statute, though he was neither the owner, nor renter of the premises. It is sufficient that he was in control during a single game and suffered it to go on; and he will not be heard to say that his possession was unlawful." Wakefield v. Commonwealth, 7 Ky. L. Rep., 295; O'Brien v. Commonwealth, id., 220.

This court, in the recent well considered case of Davis v. State, 151 S. W. Rep., 313, has not only sustained an indictment and conviction substantially, if not almost literally, the same as the indictment in this case, but also therein in effect held, that a party did not have to be the owner, renter or tenant of a house to be in control thereof and that a person who merely stayed at the residence of others during their absence, without in any way being a tenant of the owner, was in control thereof in contemplation of this statute and expressly held: "It would be immaterial whether he (appellant) was in possession by permission or had taken possession during Mr. Fich's (the owner) absence, believing it to be agreeable with the owner. If one should in any manner, while the family was absent, take possession of a house and permit gambling to be engaged in by all those who came to the house while he was in control of the house, and when it was shown that on five occasions during the time he permitted gambling to

be carried on in the house, it would be an offense against the law." This Davis case we regard as directly in point and applicable to this case. See also De Los Santos v. State, 65 Texas Crim. Rep., 518, 146 S. W. Rep., 919; Humphreys v. State, 34 Texas Crim. Rep., 434.

We think it is clear and beyond question from the evidence in this case that in contemplation of our statute and the absolute and unquestioned control that appellant had of the door on the ground floor of said building and the stairway leading up to the second floor and the room on said floor, through which and from which the only access to said attic was had by a ladder therefrom into the attic; and that appellant knew that from day to day and week to week and month to month large numbers of negroes, both day and night, numbering as many as fifty to seventy-five frequently, congregated in said attic, reaching it only and solely through his door, his stairway, his room and a ladder therein and that he was frequently in said attic, saw and knew gambling was going on therein almost constantly; that he himself on many occasions was in charge of the games, banking them and himself engaging in the games and that he had a partner to whom he furnished money whom he knew was gambling in said attic and divided the gains and losses in the games with him; that he waited on the parties up there and at their instance brought and delivered to them intoxicating liquor,—beer,—and that he, from time to time, according to his own testimony, broke up and stopped the gambling in said attic, and that altogether the jury were not only authorized to find that he was in control of said attic, although he did not have it leased from the owner, but that no other conclusion could have reasonably been reached from the testimony than that he was in control thereof.

As we have shown above, in the first part of this opinion, we think it clear that the proper construction of said statute does not require that the indictment shall allege and the proof show that appellant *kept* the said property for the purpose of being used as a gambling house. In other words, that in order to show that he was guilty of permitting gaming to be carried on in said attic it was not necessary to allege or prove that he, or anyone else, *kept that place as a gambling house,* or that it was *kept* for the purpose of using it as a gambling house. It is true the statute makes anyone who *keeps* it for the purpose of being used as a gambling place guilty of an offense. That by no means would prevent the Legislature from passing, or show that this statute itself, did not also provide, as we think it clearly does, that anyone who knowingly permitted the property to be used would likewise be guilty. The words "so used" in our opinion do not relate back to and make it necessary in order to commit the offense of knowingly permitting the property to be used for gaming, that it shall also be *kept* as a gambling house, but applies to the other portion of the statute which makes it an offense for anyone to *keep for the purpose of being used,* property or premises, as a place to gamble. Keeping it for that purpose is a separate and distinct offense made so by the statute. Knowingly permit-

ting it to be used for gaming, although not kept as and for a gambling house, is also an offense under this statute. "So used" does not mean and can not properly be construed to relate back and include "kept." Property being *used* for gaming need not necessarily be *kept* for that purpose.

In our opinion each of the counts in the indictment in this case correctly and properly charged a violation of said statute. That appellant's motion to quash them was properly overruled; that his objections to the charge of the court, following, in submitting the questions of a violation of the law as charged by each count of said indictment, are not well taken, and that the proof was amply sufficient to show that appellant was in control of the attic in contemplation of said statute and that he knowingly permitted gaming to be practically constantly carried on there, and the evidence is amply sufficient to in every way sustain the conviction. The judgment is, therefore, affirmed.

*Affirmed.*

### ON REHEARING.

### May 7, 1913.

PRENDERGAST, JUDGE.—There is but one question raised on this rehearing necessary to pass upon. Appellant contends, in effect, that because articles 551, 572 and 573 make the same acts misdemeanors punishable by fine only, which articles 558 and 559 of said Code make felonies, punishable by imprisonment in the penitentiary, that they are in fatal conflict, nullify each other, and said felony articles, making it a felony to knowingly permit gambling on property, under one's control, are not now in force, and this conviction can not stand.

This makes it necessary for us to review these several articles, the date of their enactment, their purpose and object, and the effect of placing articles 551, 572 and 573 in said Code of 1911.

Article 551 of the 1911 Code was the Act of 1901, page 267, which amended and completely took the place of article 382, as it was, of the Revised Code of 1895. This article as it was enacted by said Act of 1901, was:

"Article 551 (382). If any person shall keep or exhibit for the purpose of gaming, any gaming table or bank of any name or description whatever, or any table or bank used for gaming which has no name, or slot machine, any pigeon-hole table, or jenny lind table, or nine or ten pin alley, table or alley of any kind whatever, regardless of the number of pins, balls or rings used for gaming, and such pigeon-hole table or jenny lind table, or nine or ten pin alley, table, or alley of any kind whatever, regardless of the number of pins, balls or rings used or slot machines, shall be considered as used for gaming if the table fees or alley fees, or money or anything of value is bet thereon, or shall be in any manner interested in keeping or exhibiting any such table or bank, or nine or ten pin alley, table or alley of any kind what-

ever, regardless of the number of pins, balls or rings used, or slot machines, at any place, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars and imprisonment in the county jail for not less than ten nor more than ninety days, regardless of whether any of the above mentioned games, tables, banks or alleys are licensed by law or not."

Said articles 572 (389) and 573 (390), as they were in the said 1895 Revised Code, are copied literally in said 1911 revision and they are, respectively:.

"Article 572 (389). If any person shall permit any game prohibited by the provisions of this chapter to be played in his house, or a house under his control, the said house being a public place, or the said premises being appurtenances to a public place, he shall be fined not less than twenty nor more than one hundred dollars."

"Article 573 (390). If any person shall rent to another a room or house for the purpose of being used as a place for playing, dealing or exhibiting any of the games prohibited by the provisions of this chapter, he shall be fined not less than twenty-five nor more than one hundred dollars."

While the Thirtieth Legislature was in regular session in 1907, the horrible tragedy of the killing of Mr. McLain, the county attorney of Tarrant County, by a gambler, occurred, caused by the attempted enforcement by Mr. McLain of the gaming laws as they then existed. This so aroused public sentiment all over the State, and the said Legislature, all of which has heretofore been recited by the opinions of this court, that said Legislature was induced to take up and revise in many particulars the gambling statutes as they then existed, and they passed the Act of March 28, 1907, page 107, making the penalties much more severe.

The title to this Act, among other things, says that it is an Act to amend article 388 of the Penal Code and to add to said Code articles 388a to 388n, inclusive, "and generally to suppress gambling; repealing all laws in conflict therewith and declaring an emergency." Then enacts article 388 and adds 388a to 388n, inclusive, which are now articles 557 to 571, inclusive, of our Code. In the emergency clause, which is section 2 of said Act, it is stated: "The prevalence of gaming in this State in defiance of good morals and of a sound public policy, and the inadequacy of the statutes of this State to suppress the evil, create an imperative public necessity demanding the suspension of the constitutional rule requiring bills to be read on three several days," and thereby suspends said constitutional rule as authorized by the Constitution, and enacts that said Act shall take immediate effect. Said article. 388a, as enacted by that Act, is as follows:

"Article 388a. If any person shall, directly or as agent or employe for another or through any agent or agents, keep or exhibit, for the purpose of gaming, any policy game, any gaming table, bank, wheel or device of any name or description whatever, or any table, bank, wheel

or device for the purpose of gaming, which has no name, or any slot machine, any pigeon-hole table, any jenny lind table, ten pin alley or table or alley of any kind whatsoever, regardless of the name, or whether named or not, or of the number of pins, balls, or rings used for gaming, shall be guilty of a felony, and upon conviction shall be punished by confinement in the penitentiary not less than two nor more than four years, regardless of whether any of the above mentioned games, tables, banks, alleys, wheels, devices or slot machines are licensed by law or not; provided, that any such alley, table, bank, wheel, machine or device shall be considered as used for gaming, if the table fees, alley fees, or money or anything of value is bet thereon."

In our opinion this article so enacted in 1907 was intended by the Legislature, and had the effect of taking the place of and entirely supplanting the said article 551 (382) above quoted, and by implication, if not expressly, clearly repealed it.

Article 388b of said Act is as follows:

"Article 388b. If any person shall rent to another or shall keep or be in any manner interested in keeping any premises, building, room or place for the purpose of being used as a place to bet or wager, or to gamble with cards, dice, dominoes or to keep or exhibit for the purpose of gaming, any bank, table, alley, machine, wheel or device whatsoever, or as a place where people resort to gamble, bet or wager upon anything whatever or shall knowingly permit property or premises of which he is owner, or which is under his control to be so used, shall be guilty of a felony and upon conviction shall be punished by confinement in the penitentiary not less than two nor more than four years, regardless of whether any of the above mentioned games, tables, banks, alleys, machines, wheels or devices, or things are licensed by law or not, and any place or device shall be considered as used for gaming or to gamble with or for betting or wagering, if any fees, money or anything of value is bet thereon, or if the same is resorted to for the purpose of gaming or betting."

In our opinion this article of said Act clearly supplied and took the place of the said articles 572 (389) and 573 (390) of the Code and law as it theretofore existed and it was so intended by the Legislature, and by implication clearly repealed them.

We recognize the rule that repeals by implication is not favored, yet there is another rule which is elementary and equally as well established, and that is, where a new law covers the whole subject matter of an old, and prescribes a penalty different from that provided in the old, that the former is repealed by implication. Fleeks v. State, 47 Texas Crim. Rep., 327. It is needless to cite the many cases of all the courts and all the text-books in support of this proposition. We think it clear as stated above that article 388a of the said Act of 1907, covered the whole subject matter of said article 382, as it then existed, and prescribed a different penalty from that of the old law and clearly had

the effect to repeal by implication said article of the old Code, or old law.

Again, we are clearly of the opinion that said article 388b of said Act of 1907, covered the whole subject matter of said articles 389 and 390 as they then and theretofore existed, and prescribed a different penalty from what they provided and that it was the intention of the Legislature, and it had the effect of repealing by implication, the said articles 389 and 390. We deem it unnecessary to further discuss this subject and specifically point out how the said new Act covered the whole subject matter of the old for, having quoted them above, they show for themselves.

We think that this court was in error in holding that the said Act of 1907, did not repeal said article 389 of the Penal Code as announced in the case of Simons v. State, 56 Texas Crim. Rep., 339, and that case on that point is hereby expressly overruled.

That brings us to the next question necessary to be decided and that is, what effect the recopying in the Revised Code of 1911 said repealed articles 551, 572 and 573, as well as said articles 558 and 559, repealing them, had. Did it have the effect, as contended by appellant, to invalidate each and all of said articles, the new, as well as the old, and leave this State without any law on that subject at all? We can not find any decision in this State directly deciding the point, and appellant cites none.

By the Act of March 19, 1909, page 130, the Legislature provided for the appointment of three commissioners to revise and digest the civil and criminal laws of this State, and in this respect specifically prescribed their duties. By section 1 it was enacted: "Said commissioners shall adopt such of the Revised Statutes, Civil and Criminal, *as have not been repealed or amended,* together with an appropriate arrangement of titles, articles, marginal references and chapter head lines, and shall not change the words or punctuations thereof except in cases of evident clerical or typographical errors; or to improve the verbiage or make clear the meaning of the text, provided the present numbering or arrangement of the articles is not required to be preserved." (Italics ours.) Then by other sections of said Act they are required to embody the result of their labors in two bills for the Thirty-second Legislature,—one containing the civil statutes, and the other, the entire body of the statutes relating to criminal law, properly indexed, annotated and digested, and report to the Governor before the meeting of the Thirty-second Legislature. All this was done and the Legislature passed the said Criminal Code as reported by said commissioners with all of said articles therein exactly as they had theretofore been. By said Act of 1909, it is seen clearly that the commissioners had no right, power or authority to enact or place in said codes any new provision, or repealed law—their duties were restricted, as shown in this respect, to adopting only such criminal laws *"as have not been repealed or amended."*

Taking into consideration the history and various enactments of our gambling laws, we are of the opinion that clearly the Legislature did not intend by enacting the Code with these old repealed articles in it, to thereby invalidate and render void some of the most material provisions of our law prohibiting and punishing persons for keeping and running gambling houses and for permitting gambling in houses and places under their control. We think the history of this legislation and the enactment of the various Acts of the Legislature show clearly the reverse of any such intention, and that it all shows that the Legislature did not intend to repeal the provisions of the Act of 1907, prescribing and punishing offenses as therein prescribed. While, as stated above, we have been unable to find where the courts of our own State have expressly decided this question, we find that the courts of other States have decided the question, and said decisions and the text-book writers lay down and establish this doctrine:

Where a statute upon a specific subject has been repealed, not expressly but by implication, by the enactment of a later statute upon the same subject inconsistent with the first, and both laws are subsequently included in a revision or codification, they still have the same relative force and effect as before the codification; that is to say, the earlier remains repealed by the later statute. In such a case the presumption and fact is that the repeal of the earlier statute has been overlooked by the codifiers and Legislature. Lyon v. Ogden, 85 Maine, 374; Steele v. State, 61 Ala., 213; Mobile Savings Bank v. Patty, 16 Fed. Rep., 751; Olsen v. Haritwen, 57 Fed. Rep., 845; 2 Lewis' Sutherland Stat. Const., sec. 451, and authorities there cited. Ex parte Cox, 53 Texas Crim. Rep., 240; Ex parte Muckenfuss, 52 Texas Crim. Rep., 467. Many other authorities might be cited, but we deem it unnecessary.

So that we hold that, notwithstanding said repealed articles 551, 572 and 573 are copied in said revision of 1911 by said revising commissioners, that they were not thereby re-enacted, but inadvertently and by mistake, included therein, and that the said articles of said Act of 1907, as they were before the said Code of 1911 was passed, are still the law and in force as contained in said 1911 revision.

We have been materially aided by the able brief filed herein for the State by the Hon. C. A. Sweeton, Assistant Attorney-General, as well as a collation of the authorities voluntarily furnished us in this matter by Mr. Branch, the author of Branch's Crim. Law of Texas.

The motion for rehearing is therefore overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE.—I have given this case as careful investigation as the heavy press of court work will fairly admit. I can not concur with the prevailing opinion and will write my views when I conveniently can do so.

DAVIDSON, PRESIDING JUDGE (dissenting).—I have been unable to agree with my brethren and dissent, and in doing so have substantially

followed the motion for rehearing filed by Messrs. Williams & Williams, attorneys for appellant.

Appellant was convicted under article 388b, being article 559, Penal Code of 1911, which for the sake of brevity I will hereafter refer to as the present Code. This article is as follows:

"If any person shall rent to another, or shall keep or be in any manner interested in keeping, any premises, building, room, or place for the purpose of being used as a place to bet or wager, or to gamble with cards, dice, dominoes, or to keep or exhibit for the purpose of gaming, any bank, table, alley, machine, wheel or device whatsoever, or as a place where people resort to gamble, bet or wager upon anything whatsoever, or shall knowingly permit property or premises of which he is owner, or which is under his control, to be so used, shall be guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary not less than two, nor more than four years, regardless of whether any of the above mentioned games, tables, bank, alleys, machine, wheels or devices, or things, are licensed by law or not; and any place or device shall be considered as used for gaming or to gamble with, or for betting or wagering, if any fees, money or anything of value is bet thereon, or if the same is resorted to for the purpose of gaming or betting."

Old article 389 being article 572 of the present Code, is as follows:

First. "If any person shall permit any game prohibited by the provisions of this chapter (being the same games mentioned above) to be played in his house; second, or a house under his control, the said house being a public place, or the said premises being appurtenances to a public place, he shall be fined not less than twenty-five nor more than one hundred dollars."

Appellant urges the proposition that these two articles are, in effect, the same, and that the same acts which constitute a violation of one would constitute a violation of the other, and that the acts for which he stands convicted would constitute a violation of each article. The majority opinion agrees that this contention is correct. Appellant, however, further contends that, therefore, said articles being in such conflict, the one prescribed a misdemeanor penalty and the other a felony for the same acts, both articles are nugatory, in so far as they conflict, and must fall.

In support of his position, he relies upon articles 1, 3 and 6 of the Penal Code.

Article 1 is as follows: "The design of enacting this Code is to define in plain language every offense against the laws of this State, and affix to each offense its proper punishment."

Article 3 is as follows: "In order that the system of penal law in force in this State may be complete within itself, and that no system of foreign laws, written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission, unless the

same is made a penal offense, and a penalty is affixed thereto by the written law of this State."

Article 6 is as follows: "Whenever it appears that a provision of the penal law is so indefinitely framed, or of such doubtful construction that it can not be understood, either from the language in which it is expressed, or from some other written law of the State, such penal law shall be regarded as wholly inoperative."

My brethren hold that article 559 of the present Code, which was passed in 1907 by necessary implication, repealed article 572, which was passed in 1881, and that for this reason the codifiers only being directed by the Act of 1909 to bring forward such statutes as had not been "amended or repealed," that article 572, having been so repealed by implication, was improperly brought forward and is therefore improperly in the present Code.

In this connection, in view of the fact that this court having held in Simons v. State, 56 Texas Crim. Rep., 339, that article 572 of the present Code (being as stated old article 389) was not repealed by article 559, and that the decision being the construction given the statute by the court of last resort and not having been overruled at the time the codifiers acted, it occurs to me that the codifiers would have been going beyond the scope of their authority to substitute their opinion, if such they had, that article 572 had been repealed by implication in the face of the direct ruling of this court that it had not been repealed. The codifiers were required to bring forward all unrepealed laws. They, therefore, were correct in bringing forward article 572 under the Simons case. But suppose the Legislature had directly repealed it? That body had the authority to re-enact it in the Code, and not only so, but did in fact make it a part of the Penal Code. That body may enact, repeal and re-enact at their pleasure, and this court is powerless to interfere. By bringing it forward in the Penal Code, it had the effect to re-enact or to continue it in force (Sutherland Statutory Construction, 134-161), if article 389, now 572, had been repealed by old article 388b, as contended by my brethren. It will not be questioned that the Legislature has the authority to re-enact a repealed article. That this authority could be exercised by re-enacting that article in the Revised Code is legally unquestionable. That it was made a part of the Code is conceded. The majority opinion holds the Legislature powerless to place said article in the Code because said article had once been repealed. This is sui generis as a rule of construction. The majority opinion, in effect, admits that if articles 559 and 572, together with other articles prohibiting gambling, etc., had been introduced in a separate bill and regularly passed by the Legislature that the position of appellant would be sound, and that neither of the two statutes would stand and appellant would, therefore, be entitled to have his case reversed and dismissed. In this contention I concur, but I go further and say that in view of this construction under the present Code, article 572 is of equal dignity with article 559, that one is as much the law

of this State as the other, both having been passed as separate articles in the same bill, and that being in conflict, as the majority hold, both must fall, they both being of the same bill enacted and passed by the Legislature in due and proper form, as I shall attempt to show. In my opinion, it is wholly immaterial whether article 559, when passed in 1907, repealed article 572, or as to what the status of the statutory law upon this subject was prior to the Act of 1911, by which our present Penal Code was adopted.

Nor do I think it material to inquire into the scope of authority of the Board of Codifiers, for the reason that their work, whatever it was and under whatsoever authority it may have been done, was reported to the Legislature and that body, by a solemn enactment from that work, enacted the present Penal Code of this State, which includes article 572 (being old article 389) as well as article 559 (being old article 388b). The Act makes and constitutes every article in the Penal Code a part thereof and each article of the Constitution of this State provides that no bill shall contain more than one subject, which shall be expressed in its title; section 36 provides that no law shall be amended, or revised by reference to its title. Section 43 of the same article provides: "The first session of the Legislature under this Constitution shall provide for revising, digesting and publishing the laws, civil and criminal, and a like revision, digest and publication may be made every ten years thereafter; provided, that in the adoption and giving effect to any such digest or revision, the Legislature shall not be limited by sections 35 and 36 of this article."

It is thus seen that there is not only direct constitutional authority for the passage in one bill of the Penal Code and Code of Criminal Procedure, but it is expressly commanded to be done.

The Thirty-second Legislature, Acts of 1911, introduced and regularly passed the following bill:

## A BILL

### To be entitled

"An Act to adopt and establish a 'Penal Code' and a 'Code of Criminal Procedure' for the State of Texas.

Section 1. *Be it enacted by the Legislature of the State of Texas:* That the following titles, chapters and articles shall hereafter constitute the Penal Code of the State of Texas." Then follows the present Penal Code, enacted by the Legislature and published by authority of the State of Texas and circulated by the Secretary of State.

At the beginning of the Code of Criminal Procedure appears the second section of this bill, as follows:

"Sec. 2. Be it further enacted, that the following titles, chapters and articles shall hereafter constitute the Code of Criminal Procedure of the State of Texas, towit:"

Then follows the entire Code of Criminal Procedure, and this bill includes not only the entire Penal Code, but also the Code of Criminal Procedure, and is duly certified by the Secretary of State in the manner and form required by law, as being a bill duly and legally passed by the Legislature. In the Penal Code, as so passed, occur both articles 559 and 572.

Under our decisions, it is conclusively presumed that when the codifiers made their report, the same was duly referred to appropriate committees of the Legislature; that these committees presented a bill, which was duly reported to that body, embodying such of said work as was approved, and that said bill was, in due time, as provided by the Constitution, referred again to the committee, who reported it back to the house in which it originated, and that said bill, with such amendments as the Legislature saw fit to make, was duly and legally passed by regular procedure and became a law of this State, as is so certified by the Secretary of State. The records show that this was in fact done by Senate and House Journal, 1911.

This being true, in my opinion, the limitations upon the authority of the Board of Codifiers, or whether in fact there was or was not any limitation on the Board of Codifiers, is wholly immaterial to the issue involved. The two articles of the Code, referred to, were both incorporated in a valid bill passed by the Legislature in the same Act, at the same time, and therefore are of equal dignity, and must so stand in the courts regardless of what their past status was or may have been. To hold otherwise would be to say that the repeal of a statute by one Legislature would preclude its re-enactment by a subsequent Legislature. No court would venture to announce such a rule.

Concede, if desired, that the majority of the members of the Legislature did not know that these two inconsistent articles were in the bill. This does not cure the fact that they were. Nor does it clothe the courts with authority to say that the one is there by mistake and the other is not. This court would have the same identical authority to uphold the misdemeanor statute and denounce the felony statute as a mistake as it has (as the majority opinion has done) to uphold the felony statute and denounce the misdemeanor statute as a mistake. In other words, if the Legislature put the two conflicting statutes in the bill and thereby made nugatory both and left no law upon the subject, it is not for this court, in effect, by its decisions to pass a law upon the subject. The law-making power is vested in the Legislature by our Constitution, and its assumption by the courts is inhibited by the Constitution. Art. 2, sec. 1, Const.

In this connection, it should be borne in mind that there is no saving clause in the Act by which the Penal Code and Code of Criminal Procedure of 1911 was adopted similar to the one by which previous codifications were adopted, and that decisions under those former Acts are not, therefore, necessarily in point under this one. The present Act was not a mere naked codification, but was an explicit re-enactment of

the criminal laws of this State. Its language explicitly made it such, and the legislative mandate is imperative upon the courts so long as its acts are within the constitutional limits. The language of the statute is plain and there is no room left for construction. The rule is both fundamental and elementary and has long been recognized in this State, that where a law is plain and unambiguous, Legislature should be understood to mean what they have plainly expressed. The Board of Land Commissioners v. Weedy, Dallam, 361; Engelking v. Von Wamel, 26 Texas, 470.

It is clear and unambiguous, according to the construction given by the majority opinion, that the Legislature did pass two conflicting articles in the same bill upon this subject, and that being true, there is no higher authority for us to cite than article 6 of that same bill, which provides as before quoted, that "whenever it appears that the provisions of the penal law is so indefinitely framed or of such doubtful construction that it can not be understood either from the language in which it is expressed, or from some other written law of the State, such penal law shall be regarded as wholly inoperative." Art. 6, Penal Code, 1911.

This court held in the Parshall case, 62 Texas Crim. Rep., 177, 138 S. W. Rep., 759, that the conclusive presumption was, that the Legislature had complied with all constitutional requirements, and that the courts were not permitted to go behind the Acts of the Legislature and inquire into whether they had done so or not. I dissented from the majority opinion in that case, upon the ground that there were certain constitutional requirements, that, in my opinion, were mandatory upon the Legislature, and that the courts could inquire into whether those mandates had been obeyed.

In this, the present case, however, there is no question raised or to be raised but what all constitutional requirements were complied with in the introduction and passage of our present Penal Code and Code of Criminal Procedure as a bill. Those codes were enacted as entireties.

The majority opinion goes even further back, before the Legislature of 1911 was in session, and inquires into whether or not the Board of Codifiers had properly performed their work. This, in my opinion, can not be done. The Board of Codifiers were not part of the Legislature. It is immaterial from what source the Legislature secured the data, or contents, from which the bill, embodying our present Penal Code and Code of Criminal Procedure, was drawn. It is sufficient that it was in fact drawn and properly and regularly introduced and passed by the Legislature in regular and legal manner, as is certified by the Secretary of State, under the authority of section 43, article 3 of the Constitution.

If I could lead myself away from the opinion and conclusions herein expressed, I would still find difficulty in agreeing to the majority opinion, for the reason that the re-enactment of the Penal Code now under consideration and the two articles thereof occurred after the ren-

dition of the Simons case, reported in 56 Texas Crim. Rep., 339. That case was the latest expression from this court on article 389 at the time the Code of 1911 was adopted, and that opinion held that article 389 was not repealed by article 388b, or any of its subdivisions. It would follow then that even if article 389 was in law repealed by implication, as my brethren hold for the first time in the majority opinion in this case, yet it was re-enacted by a subsequent Legislature with full knowledge of the Simons decision, holding that said article 389 was not repealed. Adams v. State, 66 Texas Crim. Rep., 220, 145 S. W. Rep., 940.

The Adams case cites and follows many cases which support the proposition herein announced. These cases also support the further proposition that the Legislature understood the construction placed on this article laid down by the court construing it.

It was said by Judge Gaines in Cargill and Dennis v. Kountze, 86 Texas, 386, page 400, that "When the Legislature which re-enacts a statute which has been construed by the courts, the presumption is that it intended that the new enactment should receive the same construction as the old. The rule is universal and is conclusive of the question under consideration." The same conclusion was reached and announced by our Supreme Court in Duke v. State, 104 Texas, 355, 137 S. W. Rep., 654, where numerous cases are cited and reviewed by Judge Ramsey writing the opinion for the court. See also Ex parte Woods, 52 Texas Crim. Rep., 575. This court has also in many cases laid down and held to the same rule, the last being Adams v. State, 66 Texas Crim. Rep., 220, 145 S. W. Rep., 940, in an exhaustive opinion by Judge Harper. In that case Judge Harper quotes approvingly from the case of the Supreme Council A. L. H. v. Anderson, as follows, in which he says it is an "apt statement of the rule." The quotation from the decision is as follows: "And it is a familiar rule that when the Legislature adopts a statute in force in another State, or re-enacts a statute formerly in force in the particular State, it will be presumed that the construction formerly placed upon the statute by the court of last resort was known to the Legislature, and that in re-enacting the statute it was the legislative intent that it should have the meaning so placed upon it by the courts." 36 Texas Civ. App., 615. The same rule was announced in Ollre v. State, 57 Texas Crim. Rep., 520; Munson v. Hallowell, 26 Texas, 474; Morgan v. Davenport, 60 Texas, 230; Brothers v. Mundell, 60 Texas, 240; Sanders v. Bridges, 67 Texas, 93. These cases cite the familiar and well known rule, and as Judge Gaines said, "the universal rule." If, however, article 389 was repealed by article 388b prior to 1911, and article 388b remained in force all the time as held by the majority, then the re-enactment of article 389 by the Act of the Legislature of 1911 would be but the re-enactment of both articles; therefore, both would be of equal force and dignity. Any view of these articles, therefore, would be fatal to the conclusion of my brethren that appellant should be held responsible under article 388b.

As before stated, taking the majority opinion, appellant could have been held as well under article 389 as under article 388b; therefore, from the standpoint of the conflict appellant should have been discharged because these articles are irreconcilable, covering the same acts and subject matter. Under our statute with reference to interpretation of the codes this conflict would make both articles inoperative. Penal Code, arts. 1, 3 and 6.

The leading case upon this point, and one which more than covers every detail of the issue here presented, is the case from the Georgia Supreme Court, entitled Central Georgia Railway Company v. The State of Georgia, reported in 42 Lawyers' Reports Annotated, 518. That was an important case, involving, as it did, a material order made by the Railway Commission of the State of Georgia, and is referred to by the author of L. R. A. as the chief authority on the question of procedure in the enactment of the code of laws. It was thoroughly well presented by some of the ablest lawyers in Georgia. At the end of the opinion, Judge Lewis, an able jurist, who delivered the opinion for the court, makes the following note: "Knowing that the Hon. Joseph R. Lamar was one of the codifiers of 1895 and had doubtless given some of the matters involved in this case consideration, we requested of him his views touching the constitutional questions raised. To this he generously responded by furnishing us with an able and thorough brief, which has been of great assistance to us in this case." The fact that the Hon. Joseph R. Lamar, referred to, is at present a member of the Supreme Court of the United States is not only an evidence of the character and ability of the lawyers engaged in this case, but he, having advised the decision as rendered, lends weight to it as authority, if further weight needs to be given an important decision of the Supreme Court of Georgia. This decision is quite lengthy, but so fully does it cover this case and my views, that I shall quote from it without stint, adopting the views expressed as my own, which they are.

The litigation, as stated by the court, arose as follows: "The latter part of section 2189 of the Civil Code gives the Railroad Commissioners power to require the location of such depots, and the establishment of such freight buildings, as the condition of the road, the safety of freight, and the public comfort and convenience require. This provision is contained in the Act of October 29, 1889 (Acts of 1889, p. 132). Under section 2196 of the Civil Code a penalty is prescribed against any railroad company doing business in this State for a violation of the rules and regulations fixed by the Railroad Commissioners. This section is a codification of section 9 of the Act of October 14, 1879 (Acts of 1878-79, p. 129). It appears from the record that on January 28, 1896, the Railroad Commissioners of this State passed an order requiring the Central of Georgia Railway Company to erect a suitable depot building at Forsyth, in Monroe County. The company refused to comply with this order, and suit was instituted by the State, through the Attorney General, in Monroe Superior Court, to recover the penalty provided for

in the above section 2196 of the Civil Code.  .  .  .  It is contended by counsel for plaintiff in error that there is no law in this State which confers upon the Railroad Commissioners the powers and authority to require a railroad company to erect depot buildings; that the Act which undertakes to confer this power, towit: the Act approved October 29, 1889, amendatory of the Act of 1879, is unconstitutional, because it contains matter different from what is expressed in the title thereof; and that the Act approved August 31, 1891, which undertook to remove the defect in the title in the Act of 1879 is itself unconstitutional, because its title does not indicate the matter contained in the body of the Act.  On the other hand, it is contended by counsel for the State that the Act of 1889 being codified as section 2189 of the new Code, the Act of 1895 adopting and making of force that Code *cured all of those defects, if any, which had existed in the Act of 1889.*  Counsel for plaintiff in error insists, however, that by the adopting Act of 1895, the Legislature never intended to make anything in the code law which was not the law before its adoption; and that, even if such was its intention, it did not have the power, under the Constitution, to enact in this way new statutes, or any changes or modifications in the existing laws of the State.  We will not pause to consider or pass upon the questions raised in reference to the constitutionality of the Acts of 1889 and 1891 as originally passed by the Legislature, but we will pass over these to consider the more important question as to what validity or force the adopting Act of the Legislature gave to the provisions in the present Code of 1895.  Upon this issue was fought the great legal battle between counsel for the contending parties in this case; and the view we take of this question, which can scarcely be measured in its importance and interest to the profession and the people generally, renders it unnecessary to consider the other constitutional questions touching defects in the titles of the original acts.  It is insisted that by the Act approved December 19, 1893, providing for the appointment of three commissioners to codify the laws of Georgia, these commissioners were simply empowered to codify and arrange in systematic and condensed form the laws then in force in the State, and had no authority whatever to embody in the code any new law, or any provision which modified any existing law of the State.  No one could hardly pretend that any new matter in the Code derives force or efficacy by virtue of the act of the commissioners alone.  Even if the Legislature had attempted to confer upon the commissioners the power to make changes in the law, and to embody in the Code such new matter as they saw proper, such an Act of the Legislature, in so far as its purpose was to thus create new legislation for the State, would have been an absolute nullity. Enacting and changing laws for a State devolves by the Constitution upon the legislative branch of its government, and that branch can not delegate the power to another.  A consideration, therefore, of the duties and powers imposed upon the code commissioners, can throw no light upon what construction should be given an Act of the Legislature adopt-

ing their work. If the codifiers introduced any new matter in the code, it, of course, amounted to nothing unless it afterwards was enacted into statute by legislative sanction. Where such matter is not inherently unconstitutional,—that is, where it embraces nothing that is not a proper subject matter of legislative enactment,—there can be no question but that the Legislature has the power to enact it into law or not, as it sees proper.

When the work of the commissioners was completed it was laid before the Legislature. It had the power to reject that work, or to accept it, and in its acceptance it had the power simply to provide for the pay of the commissioners, and the publication of their work for the use of the public; and if nothing more was done, there would have been a want of legislative sanction to any new matter embodied in the code, and hence such new matter would never have had any validity. The vital question, then, in this case, is not what the commissioners had the power to do, but what the Legislature intended to do with their work. That intention can only be gathered from what the Legislature itself has deliberately declared when it finally passed upon the work reported to it by the commissioners. This final action of the Legislature is embodied in what is known as the "adopting act" of the code approved December 16, 1895. Section 1 of that Act declares: "That the code of laws prepared under its authority by John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, and revised, fully examined, and identified by the certificate of its joint committee, and recommended and reported for adoption, and with the Acts passed by the General Assembly of 1895, added thereto by the codifiers, be, and the same is hereby adopted and made of force as the Code of Georgia." This portion of the body of the Act is by these words in the title "An Act to approve, adopt, and make of force the code of laws prepared under the direction and by authority of the General Assembly," etc. A legislative body should always be presumed to mean something by the passage of an Act. If, as contended by plaintiff in error, the Legislature by this Act intended to adopt such provisions in this code as were law anyway, without any further legislative sanction whatever, then the Act in question is absolutely meaningless. It would give no more force or effect to the Code of 1895 than such a work would have carried with it emanating from a private source, and without any legislative warrant or authority whatever. The code of law designated and identified in the Act was adopted and made of force in the Code of Georgia. Not a part of the code was then of force, but the entire code, as compiled by the commissioners. It would be difficult to conceive how language could more clearly or forcibly express the real intent of the Legislature in this matter than the words used in the title and the body of this Act. If it means anything, it means a purpose of the Legislature to adopt and make of force a code of laws, and hence to breathe into every provision in that code the vitality of a legislative enactment. Any other construction would ascribe to the Legislature the folly of declaring, in

effect, "We adopt as law in this code everything which would be law anyway without further sanction." It would be just as reasonable for that body to re-enact verbatim et literatim a statute which it recognized and knew to be already of force. Had such been the legislative will, that body would, doubtless, have pursued the same course with reference to the Code of 1895 that its predecessors followed in regard to the Codes of 1868, 1873 and 1882. The Code of 1868, known as "Irwin's Code," and also the Code of 1873, were both the work of private enterprise, their compilation not even having been previously authorized by any Act of the Legislature. The Code of 1882 was compiled in pursuance of an Act of the Legislature, but neither this edition nor the other two named received the sanction of an adopting Act. After each of these works was completed, it was, by resolution of the General Assembly, submitted, the first to a committee of three, and the last two to the Attorney General of the State, and each received favorable reports. This was a completion of the work, and all the Legislature afterwards did was to order a publication of a given number of volumes, and make appropriation therefor. When, however, the Code of 1895 was reported by the commissioners, and was examined, approved and favorably reported by a joint committee of both houses of the Legislature, that body went a step further, and passed the "Adopting Act" of 1895. Instead of treating the work as it did the three preceding editions, it pursued the same course followed by the Legislature when it passed the Act of December 19, 1860, adopting and making of force what has ever since been known as the "Code of 1863." There is a remarkable similarity between the words used in the title and body of that Act and those employed in the Act of December 16, 1895, the title of the former was, "An Act to approve, adopt and make of force, in the State of Georgia, a Revised Code of Laws prepared under the direction and by authority of the General Assembly thereof, and for other purposes therewith connected."

The title to the latter was "An Act to adopt, approve and make of force the code of laws prepared under the direction and by authority of the General Assembly, to provide for the printing and publication of the same, and for making indices thereto, and for other purposes." In the body of the former Act it was declared that the code designated "is hereby adopted as the Code of Georgia; to be of force and take effect on the 1st of January, 1862." By a subsequent Act of the Legislature this time was extended to January 1, 1863. In the body of the Act of 1895 it was declared that the code mentioned, "be, and the same is hereby adopted and made of force as the Code of Georgia." In the light of the numerous decisions of this court, some of which are hereinafter referred to, there can be no question as to what was the intent of such language in the Act of 1860; the legislative purpose being to enact into law every provision contained in the code, including such new matter as was introduced, as well as such changes and modifications as were clearly made in existing laws. The power conferred upon

the first code commissioners by the Act of December 9, 1858, was no greater than that conferred by the Act of December 19, 1893, providing for the present code. In the former Act it was provided that the commissioners should "prepare for the people of Georgia a code which should, as near as practicable, embrace, in a condensed form, the laws of Georgia, whether derived from the common law, the Constitutions, the statutes of the State, the decisions of the Supreme Court, or the statutes of England of force in this State."

"In the Act of 1893 power was conferred upon the commissioners 'to codify and arrange in systematic and condensed form the laws now in force in Georgia, from whatever source derived.' The commissioners had no more authority to make changes in the law in one instance than they had in the other. It, therefore, follows, that the effect of an adopting Act can not be measured by the powers with which the codifiers were clothed in the original Act of the Legislature, which was the first step towards providing a code. Even if the position taken by counsel for plaintiff in error be correct, that it was the Constitution of 1865 that first gave the Code of 1863 vitality and force as a legislative enactment, this will not help them out of the difficulty of their position. That Constitution, so far as it bears upon the subject, simply declares of force in this State 'all laws declared of force by an Act of the General Assembly of this State, assented to December 19, A. D. 1860, entitled "An Act to approve, adopt and make of force in this State of Georgia, a Revised Code of Laws,"' etc. The Constitution itself, therefore, refers only to such provisions in the code as were declared to be of force by the adopting Act of 1860. This necessarily carries us back to the terms of that Act, and involves the question as to what laws it intended to declare of force. There is quite a difference between a code of laws for a State and a compilation in revised form of its purposes. Its general object is to embody as near as practicable all the law of a State, from whatever source derived. When properly adopted by the law making power of a State, it has the same effect as one general Act of the Legislature containing all the provisions embraced in the volume that is thus adopted. It is more than evidentiary of the law. It is the law itself. In 6 Am. & Eng. Ency. of Law, 2d ed., p. 173, it is declared: 'The word (code) is used frequently in the United States to signify a concise, comprehensive, systematic re-enactment of the law, deduced from both its principal sources,—the pre-existing statutes and the adjudications of courts,—as distinguished from compilations of statute law only.' We quote the following from Black on Interpretation of Law (p. 363): 'Although a code of revision may be made up of many provisions drawn from various sources, though it may include the whole or parts of many previous laws and reject many others in whole or in part, though it may change or modify the existing law previously in force many new provisions, yet it is to be considered as one homogeneous whole, established "uno flatu." All its various parts or sections are to be considered and interpreted as if they were parts

of a single statute. And hence, according to the well known rule, the various provisions, if apparently conflicting must, if possible, be brought into harmony and agreement. In order to bring about this harmony and agreement, the court which is called upon to interpret the code will look through the whole work, and gather such assistance as may be afforded by a complete survey of it.' Whenever the Legislature, therefore, employs such words as 'adopting a code,' no other legitimate or reasonable construction can be given the language itself than an intention .to enact and make of force as a statute every provision in the .entire work which it has under consideration. Such being the intention, then, of the Legislature by the adopting Act of 1895, it remains to be considered whether or not this purpose has been legally and constitutionally declared."

The question also arose in that case as to the reading of a bill on three several days, as also the question that no one bill shall contain more than one subject matter, which shall be expressed in its title, and the court said that the last question, above referred to, "presents the only question in the case, which, to our minds, is at all difficult of solution." That question, however, is not presented in the case now before us, because under our Constitution special provision is made by the articles referred to in the early part of this dissent for a codification of our law.

In the case of Ex parte Thomas, 113 Alabama, 1, it is declared: "A code or body or system of law adopted, or enacted by a single Act of the General Assembly, though it may contain inconsistent or repugnant provisions, or one section or part may be modified, and, to the extent of the modification, .controlled by another, is not within the letter or spirit of the mandate of the Constitution. It is not within the legislative evil it is designed to remove, nor can it be supposed that it was within the contemplation of the framers of the Constitution. Though, for convenience, the code is published in two volumes, the one pertaining entirely to that which may be termed civil, and the other to that which may be termed criminal, legislation, was adopted by a single Act, entitled 'An Act to adopt a code of laws for the State of Alabama.'"
It is true the Constitution of Alabama authorizes the adoption of the code by the Legislature, but the Constitution, nevertheless, required that the subject should be described in the title, and Brickell, Ch. J., in that case, quoted the following from Walker, Ch. J., in Ex parte Pollard, 40 Ala., 77: "The Constitution requires that only one subject shall be embraced, and that it should be described in the title. 'Subject' is a very indefinite word. A phrase may state the subject in a very general or indefinite manner, or with minute particularity. The subject of laws with such titles as the following: 'To adopt a Penal Code,' 'To adopt the common law of England in part,' 'To adopt a code of laws,' 'To ratify the by-laws of a corporation,'—would be expressed in a very general way, and very little knowledge of the specific provisions of the

laws could be gleaned from the title; yet it would nevertheless be true that the subject was described in the title." See Bales v. State, 63 Ala., 30; Dew v. Cunningham, 28 Ala., 466, 65 Am. Dec., 362; Hoover v. State, 59 Ala., 57. The Constitution of the State of Washington provides: "No bill shall embrace more than one subject, and that shall be expressed in the title." Art. 2, sec. 19.

In the case of Marston v. Humes, 3 Wash., 267, it was held that the Code of 1881 of that State was a valid and binding body of laws, arranged and consequently sectionized under authority of the Legislature of 1881 from laws revised and re-enacted by that body, and ratified by subsequent Legislatures by constant reference thereto as the Code of 1881. On page 276, 3 Wash., the court says: "If the Legislature can thus, by a name sufficiently comprehensive, embrace all the subjects properly relating to civil procedure, it must follow that by adopting a subject sufficiently general it can embrace in one Act all the statute law of the State. In other words, the Legislature may adopt just as comprehensive a title as it sees fit, and if such title, when taken by itself, relates to a unified subject or object, it is good, however much such unified subject is capable of division." There is a like restriction in the Constitution of West Virginia against the passage of laws containing more than one subject, and containing matter different from what is expressed in the title.

The last paragraph, which is also taken from the Georgia case first referred to, is here used for the purpose of showing that prejudicial construction has always been in favor of upholding an entire code passed in one Act, *as one bill of the Legislature,* even without special constitutional sanction, and giving to each article all the solemnity and force that would be given it, if included in an ordinary bill. The enacting clause to the Revised Penal Code provides and says the "titles, chapters and articles shall hereafter constitute the Penal Code of the State of Texas." This necessarily includes every article contained in the Penal Code as passed by the Legislature of 1911.

In The State v. Mines, 38 W. Va., 125, it was held: "It can not be doubted that under the title of an Act passed in 1868, establishing a code of laws, it was valid to insert in that code a named section." It is thus seen that laws entirely new, or laws that were unconstitutional by reason of some defect in the caption, as well as laws that had been repealed, may be re-enacted and given force in one bill, including the entire code. To hold otherwise would deprive the Legislature of its expressly granted constitutional authority to enact laws.

I quote further from the Georgia case: "It is further contended by plaintiff in error that the embodiment in the code of an unconstitutional law is an error which the Legislature did not intend to sanction by its act adopting the code. If the infirmity of the Act relates to matter upon which the Constitution prohibits any legislation at all, of course the Act would be void, it matters not where found, nor how often adopted. Where, however, the defect is not inherent in the sub-

ject matter itself, but relates simply to its manner of passage under a defective title, it is, of course, permissible for the Legislature to re-enact the measure under a proper title. If the Act of 1889 in question, empowering Railroad Commissioners to require railroad companies to erect depots, was unconstitutional, as originally passed, because its title did not indicate what was in its body, it simply amounted to no law, and was just as if there had never been any attempt to legislate upon the subject. Such matter afterwards embraced in the code duly adopted is like any other matter contained therein, and has force and effect from the time of the adoption of the code. The changes made in the Code of 1863 are, perhaps, much more numerous than was at first supposed. Many of these modify previous statutes by omitting a portion of their provisions, others alter the statute by adding more thereto, while others contain entirely new matter emanating from the brains of the codifiers, and not found either in the common or statute law. Yet all these alterations and additions have been treated by this court in its numerous decisions relating thereto as valid law. See Mason & W. R. Co. v. Johnson, 38 Ga., 409; Phillips v. Solomon, 42 Ga., 192; Gardner v. Moore, 51 Ga., 269; Miller v. Southwestern R. Co., 55 Ga., 143; Georgia R. & Bkg. Co. v. Kirkpatrick, 35 Ga., 144; Georgia R. Co. v. Ivey, 73 Ga., 499; Wason v. Swann, 83 Ga., 198; Verdery v. Dotterer, 69 Ga., 194; Adams v. Barlow, 69 Ga., 302; Banks v. Sloat, 69 Ga., 330; Freeman v. Cherry, 46 Ga., 14; Ewing v. Shropshire, 80 Ga., 374; Ellis v. Darden, 86 Ga., 368, L. R. A., 61; McVicker v. Conkle, 96 Ga., 584."

In concluding the opinion and referring to the adoption of the different codes of Georgia, the court further said: "They have been handed down from code to code, and still live in the present code, a monument to the legal learning and ability of their author, and to the genius of his masterly intellect. Yet these changes were never vitalized into life and power until the Legislature, in its wisdom, adopted them as a part of the statute law of the State. What changes have occurred in the new Code of 1895 have likewise been thus adopted, and they should receive at the hands of the judiciary the same respect and consideration as any other Act of the legislative department of the State."

This is not the first code of laws which has been adopted by this State and recognized by the courts of this State. In 1856, as in 1879, and again in 1895, a code of laws was adopted for this State, and it had never heretofore been doubted that each section of these various codes became and was after adoption thereof, statutory law of this State, regardless of whether the same had previously existed, was an entirely new matter, or was repealed matter that had been re-enacted. As said by the Court of Civil Appeals in McLane v. Paschal, 8 Texas Civ. App., 398, in passing upon the Civil Code of the State of Texas, adopted in 1879: "The court, for the purpose of informing itself of the existence, or terms of law, can not look beyond the enrolled Act certified to by those officers who are charged by the Constitution with the duty of

certifying and with the duty of deciding what laws have been enacted." Citing Usener v. State, 8 Texas Civ. App., 177; The State v. Swift, 10 Nev., 176; In Re Dick Duncan, 139 U. S., 453; Sherman v. Story, 30 Cal., 253; Day Co. v. The State, 68 Texas, 526; Ex parte Tipton, 28 Texas Crim. App., 438; Pangborn v. Young, 32. N. J. Law, 29; Leeper v. Texas, 139 U. S., 462; Blessing v. Galveston, 42 Texas, 641; Miller v. The State, 3 Ohio St., 483; Duncan v. McCall, 139 U. S., 462; Field v. Clark, 143 U. S., 649.

As before stated in this opinion, I do not agree with some of the cases holding that the courts may be precluded from going behind the action of the Legislature and inquiring into the question of whether or not certain mandatory sections of the Constitution had been complied with in the passage of the bill, and prefer to follow that line of authorities in this and other States holding to the contrary. Yet, I do fully agree that you may not go behind the Act itself to inquire into the terms, or the language, or the purposes of the measure, as plainly expressed in its text. The adoption, however, referred to by me, does not arise, or need discussion in this case, for the reason that there is no question raised of the regularity by which the Act of 1911, including the two articles of the Penal Code under consideration, was passed. Being of the opinion that articles 559 and 572 of section 1 of the Act of the Thirty-second Legislature (said section 1 being the present Penal Code of the State of Texas) are in direct conflict, and that by the terms of said articles, the same acts are, in one instance, made a misdemeanor, while by the other they are made a felony; that both of said Acts are in violation of articles 1, 3 and 6 of the Penal Code, and are, therefore, of no effect and void, I am therefore of the opinion that the judgment of the trial court should be reversed and the prosecution dismissed.

I regard the questions involved in the majority opinion in this case of such fundamental character as to make it my duty, holding the views I do, to file my dissent. For further discussion of this same question, see dissenting opinion in Stephens v. State, filed June 28, 1913, but not yet officially reported.